UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO.: 18-160 |
| v. | * | SECTION: "J" |
| JODY LAMBERT | * | |
| | * * * | |

## FACTUAL BASIS

The defendant, **JODY LAMBERT** ("**LAMBERT**"), agrees to plead guilty to a Superseding Bill of Information charging defendant with one count of civil rights conspiracy, in violation of 18 U.S.C. § 241, for willfully conspiring to injure, oppress, threaten, and intimidate D.P. in the free exercise of her rights under the federal Fair Housing Act. The defendant agrees that, if this matter were to go to trial, the government would prove the following facts beyond a reasonable doubt, and the defendant also agrees that the following facts are true:

In 2015, **LAMBERT** lived with his mother, R.K., his stepfather, T.J.K., his sister, B.L., and his stepsister, T.K. (who is T.J.K.'s biological daughter), along with his other family members (collectively, "the family"). Until late August 2015, the family lived together in a home in Kentwood, Louisiana ("the Kentwood home"). In August 2015, **LAMBERT**, R.K., T.J.K., and T.K. moved to a property containing a mobile home on Rushing Lane in Amite, Louisiana ("the

AUSA
Defendant
Defense Counsel

Rushing Lane property"). B.L. did not live at the Rushing Lane property full-time, but, starting in August 2015, B.L. was regularly present at the property and lived there periodically.

D.P. is a relative of **LAMBERT**'s mother, R.K. In 2015, D.P. and her mother came to live with the family in the Kentwood home. D.P. has been diagnosed with disabilities, including autism, and is handicapped, as that term is defined in 42 U.S.C. § 3602(h). Based on this diagnosis, D.P. received a government disability check each month to pay for her living expenses. D.P.'s mother died on August 12, 2015. Shortly afterward, D.P. moved with **LAMBERT**, R.K., T.J.K., and T.K. to the Rushing Lane property because D.P. had nowhere else to go. Also shortly after D.P.'s mother died, T.J.K. started receiving D.P.'s monthly government disability check on D.P.'s behalf.

Initially, at the Rushing Lane property, D.P. was permitted to sleep inside the family's mobile home. After a few days, however, D.P. was required to sleep in a camping tent in the backyard. At R.K.'s direction, the family locked D.P. inside the tent at night with a small padlock that fastened the tent's zipper shut. T.K. was usually in charge of locking and unlocking D.P.'s tent. On more than one occasion, **LAMBERT** also locked and unlocked D.P.'s tent.

At some point while D.P. was living in the locked tent, the family installed portable sheds on the Rushing Lane property. R.K. and T.J.K. ordered D.P. to live in one of these sheds. The shed did not have running water or electricity. The family gave D.P. a five-gallon bucket to use as a toilet while she was inside the shed. At night, at R.K.'s and T.J.K.'s direction, the family closed the door to the shed with a latch from the outside so that D.P. could not get out of the shed. After a time, at R.K. and T.J.K.'s direction, the family also locked the shed from the outside by

AUSA
Defendant
Defense Counsel

threading a small padlock through the closed latch. On more than one occasion, **LAMBERT** locked D.P. into the shed at night.

After D.P. lived in the shed for a time, T.J.K. became angry with D.P. for spilling water on the shed's floor, causing the floor to rot. At T.J.K. and R.K.'s direction, D.P. was again required to live in a locked tent in the backyard. This time, the tent was placed under an open wooden structure.

One day, several months prior to June 30, 2016, and during the time D.P. was living in the locked tent under the open wooden structure, T.J.K. and R.K. discussed where to house D.P. at the Rushing Lane property because they did not want her to live inside the mobile home. During this discussion, T.J.K. and R.K. agreed that they would move D.P.'s tent into a locked backyard cage and force D.P. to live in the cage. The cage was already located in the backyard and had previously been used to house animals.

Immediately after R.K. and T.J.K. reached this decision, the family started preparing the cage for D.P. **LAMBERT**, T.K. and one of R.K.'s minor children gathered branches and a tarp to put over the cage as camouflage. Once the cage was ready, T.J.K. told D.P. that if she was going to act "retarded" and "play stupid," then she would be treated accordingly. T.J.K. and R.K. then ordered D.P. into the cage. D.P. complied, and R.K. locked the cage with a metal chain and padlock.

At T.J.K.'s and R.K.'s direction, D.P. was forced to live in the cage. Usually, T.K. locked D.P. into the cage at night and unlocked the cage in the morning. However, on more than one occasion, **LAMBERT** locked D.P. into the cage. D.P. was forced to live in the cage for several

AUSA
Defendant
Defense Counsel

months prior to June 30, 2016. The cage did not have running water or electricity at any point in time. While inside the cage, D.P. was required to use a five-gallon bucket as a toilet.

Throughout the time D.P. and the family lived at the Rushing Lane Property, **LAMBERT**, R.K., T.J.K., B.L., and T.K. collectively subjected D.P. to routine physical violence and threats of physical violence. Each member of the family, including **LAMBERT**, physically assaulted D.P., and **LAMBERT** knew the physical abuse of D.P. to be routine. **LAMBERT** saw this regular physical abuse and knew that these assaults often caused D.P. physical injuries. On one occasion, **LAMBERT** shoved D.P., causing her to fall to the ground. **LAMBERT** also knew of the following instances, among others, of physical violence against D.P.: T.J.K. shot D.P. with a BB gun at close range, causing BBs to lodge under D.P.'s skin; T.J.K. hit D.P. with a wooden paddle; T.J.K. burned D.P. with a lighter; T.K. dragged D.P. across the floor by D.P.'s hair; B.L. struck D.P. over the head with a wood board, causing D.P. to bleed from the resulting wound. The purpose and effect of these physical assaults was to intimidate D.P. into continued compliance with the family's orders, including, among other things, obeying orders to live inside the locked tent, the locked shed, and the backyard cage.

Throughout the time D.P. lived at the Rushing Lane property, **LAMBERT**, T.J.K., B.L., and R.K. threatened D.P. **LAMBERT** knew the threats made to D.P. to be routine. These threats included, among other things, threats to shoot D.P. if she ever tried to escape the Rushing Lane property, threats to beat her if she disobeyed the family's orders, and threats to kill her if she ever reported the family to law enforcement. On one occasion, **LAMBERT** threatened to hurt D.P. if she ever spoke to law enforcement. On another occasion, R.K. pointed a pistol at D.P. and

Page 4 of 6

AUSA
Defendant
Defense Counsel

threatened to shoot her. The purpose and effect of these threats was to scare D.P. into continued compliance with the family's orders, including, among other things, obeying orders to live inside the locked tent, the locked shed, and the backyard cage.

Throughout the time D.P. lived at the Rushing Lane property, each member of the family, including **LAMBERT**, regularly called D.P. "stupid," and "retarded," in reference to D.P.'s handicap. **LAMBERT** understood that the reason for forcing D.P. to live inside the locked tent, the locked shed, and the backyard cage was because of D.P.'s handicap, and because the family did not want D.P. to live inside the mobile home.

Throughout the time D.P. and the family lived at the Rushing Lane property, **LAMBERT**, R.K., T.J.K., B.L., and T.K. willfully combined, conspired, and agreed with each other to injure, oppress, threaten, and intimidate D.P. to interfere with her right to rent and occupy, without discrimination, a place in the family's mobile home, and to interfere with her right to leave the Rushing Lane property and rent or occupy a home elsewhere without discrimination. **LAMBERT** was aware of this plan among his other family members, agreed to participate in it, and engaged in acts both on his own and with other members of his family that advanced the plan's objective. **LAMBERT** also was aware that the purpose of this plan was to prevent D.P. from living in the mobile home because of D.P.'s handicap, and to prevent D.P. from leaving and renting or occupying a home elsewhere.

AUSA
Defendant
Defense Counsel

Both the government and the defendant, **JODY LAMBERT,** do hereby stipulate and agree that the above facts are true, and that they set forth a sufficient factual basis for the crime to which the defendant is pleading guilty.

| | |
|---|---|
| /s/ Jody Lambert     10/18/18 | /s/ Julia K. Evans     10.8.18 |
| JODY LAMBERT    (Date) | JULIA K. EVANS    (Date) |
| Defendant | Assistant United States Attorney |
| | |
| /s/ Ralph S. Whalen, Jr.   10/18/18 | /s/ Risa Berkower   10/18/18 |
| RALPH S. WHALEN, JR.   (Date) | RISA BERKOWER    (Date) |
| Counsel for Defendant | NICHOLAS REDDICK |
| | Trial Attorneys |
| | Civil Rights Division |
| | U.S. Department of Justice |